UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) Case No. 11-cr-784-6 |
| v. | ) |
| | ) Judge John W. Darrah |
| AURELIANO MONTOYA-PENA, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Defendant Aureliano Montoya-Pena, a/k/a "Jesse Montoya," filed a Motion to Suppress [191] all evidence obtained from a search of a house on December 19, 2010. An in-court hearing was held, and the parties filed post-hearing briefs. For the reasons stated below, Defendant's Motion to Suppress [191] is denied.

## BACKGROUND

On the night of December 18, 2010, agents from the Drug Enforcement Administration ("DEA") entered Aureliano Montoya-Pena's ("Defendant") house without a search warrant and located illegal drugs in an open storage container in a basement-bedroom closet. Early the next morning, at 1:25 a.m. on December 19, 2010, a DEA agent swore out a search warrant application before Magistrate Judge Arlander Keys. The house was searched and items seized, including the previously seen illegal drugs, pursuant to the warrant issued by Judge Keys.

*Affidavit in Support of Search Warrant Application*

Special Agent Jay Borns' affidavit of December 19, 2010, in support of the search warrant application contains a narrative of facts. (Dkt. No. 226-14.) The facts in support of the

1

application, generally, are as follows. That since March 2010, DEA agents have been investigating a money laundering and drug trafficking cell associated with the Los Zetas drug-trafficking cartel ("Zetas") operating in the Chicago area. DEA agents developed a cooperating source who, on December 17, 2010, notified the DEA that the Zetas intended to move a large amount of narcotics from the Chicago area to Mexico. The Zetas requested the cooperating source arrange for transportation of narcotics. On December 18, 2010, DEA agents provided a second cooperating source with a Chrysler Town & Country minivan ("Van"). Between 12:00 p.m.[1] and 2:30 p.m. on December 18, DEA agents maintained constant surveillance on the Van.

At approximately 12:00 p.m., the Van entered a parking lot; and the cooperating source exited the Van and left the keys under the floormat. Then, an unidentified individual picked up the Van and drove it to 2536 S. Harvey, Berwyn, Illinois ("House"),[2] where the Van was driven into a detached garage behind the House at 12:30 p.m. At 12:40 p.m., DEA agents observed the Van leave the garage. Agents followed the Van to the area of South 48th Court between 29th and 30th Streets in Cicero, Illinois. At 12:50 p.m., agents observed someone park the Van at that location and exit the vehicle. Agents observed this individual enter a black Chevrolet Suburban truck ("Suburban") that returned to the House and parked in the garage. The Suburban was registered to Jessie Montoya – whose driver's license lists the address of the House.

At approximately 2:30 p.m., DEA agents took custody of the Van, conducted a search and recovered approximately 130 individually wrapped brick-shaped objects concealed inside two Rubbermaid bins and a large duffle bag. The substance field-tested positive for cocaine.

---

[1] All times referenced herein are approximate.
[2] This House is referred to in the affidavit for a search warrant discussed below as the "subject premises."

After the seizure of the 130 kilograms of cocaine, agents maintained surveillance of the House; and, for hours, agents observed no lights on inside of the residence. At 8:00 p.m., agents observed lights on inside, saw an individual open the curtain to look outside, and observed lights on in the basement. At 8:35 p.m.[3], agents observed an individual in the rear of the House (later identified as Oscar Montoya-Pena), who then moved to the front sidewalk. Agents questioned Oscar, who, according to the affidavit, was evasive in his answers to questions regarding who owned the House, how he arrived at the House, and whether anyone was inside the House.

After questioning Oscar, DEA agents entered the House to determine if anyone was inside to prevent the potential destruction of evidence.[4] During the search, agents observed multiple packages consistent in appearance with the 130 kilos of cocaine seized earlier that day. No evidence was seized during the first entry into the House on December 18, 2010.

Upon executing the search warrant on December 19, 2010, agents seized the 100 kilos of cocaine previously observed, 2 pounds of methamphetamine, a rifle, a handgun, drug ledgers, drug scales, a kilo press, currency and other miscellaneous items.[5] (Dkt. No. 191 at p. 2.)

*Procedural Posture of Criminal Proceedings*

On November 2, 2011, Defendant was indicted on two counts of conspiracy to distribute cocaine and possession with intent to distribute a controlled substance in violation of federal statutes. A bench warrant for the arrest of the Defendant was also issued on November 2, 2011. The case was placed on the fugitive calendar on April 3, 2012. (Dkt. No. 55.)

---

[3] The Government's Response brief indicates this occurred at 8:15 p.m.; however, the affidavit states this occurred at approximately 8:35 p.m. *See* Dkt. 226-14 at paragraph 26.
[4] The Government's Response brief indicates this occurred at 8:30 p.m.; however, the affidavit does not identify a specific time that the entry occurred. *See* Dkt. 226-14 at paragraphs 26-28.
[5] An inventory of the executed search warrant was not attached as an exhibit in the parties' briefing.

On October 9, 2015, Defendant was taken into federal custody. On January 25, 2016, Defendant filed the Motion to Suppress, arguing that the search of his home without a search warrant on December 18, 2010, was an unconstitutional violation of his Fourth Amendment rights and that any evidence obtained from the search should be suppressed.

*Motion to Suppress Hearing*

On May 3, 2016, the Court held a hearing on the Motion to Suppress. At the hearing, two agents testified, Special Agent Timothy Oko ("Oko") and Special Agent Jay Borns ("Borns"). Agent Borns, the affiant of the search warrant affidavit, testified that a decision had been made to seek a search warrant for the House the afternoon of December 18, as early as 3:00 p.m. on December 18. (Tr. 95.) Borns also testified that he had been working with Assistant United States Attorney Gregory Deis to obtain the warrant that afternoon. (Tr. 89-96.) The warrant was not issued until 1:25 a.m. on December 19 – after the agents entered the House the night before, on December 18, which was characterized as a "protective sweep." (Tr. 9, 61, 82, 94-96).

For the most part, Oko provided testimony consistent with the facts set forth above in the affidavit signed by Borns.[6] There were some minor discrepancies. For example, Oko testified that the Suburban was silver (Tr. 21, 23-24); whereas, the affidavit states that the Suburban was black. (Dkt. No. 226-14 at p. 6, ¶ 21.)

Oko also provided additional testimony regarding several events taking place between 1:00 p.m. and 8:30 p.m. on December 18, 2010. (Tr. 33-50.) None of this additional testimony was contained in Borns' affidavit. Specifically, Oko testified that at the time that agents seized

---

[6] The exhibits contained in the Government's courtesy copy of its Post-Hearing Response to Defendant's Motion to Suppress are in a different order than the electronic filing as it appears on the docket. For purposes of this Opinion, referenced exhibits reflect the exhibit number as it appears on the docket.

the Van, the Cicero Police informed the DEA agents that they had received a call from an unidentified woman[7] who said she observed suspicious activity involving the Van. (Tr. 35.) She stated that individuals were "messing" with a brick-shaped package in the rear of the Van; the package fell to the ground, white powder came out of the package, and then the individuals parked the Van on 48th Court. (*Id.*) However, the surveillance team did not see any activity as described. (*Id.*)

Oko also testified that, at 1:12 p.m., surveillance officers saw a woman and a man (later identified as Raymundo Echeviarra) exit the House and enter a four-door Mercedes Benz. (Tr. 41.) The agents followed the Mercedes and watched as it drove slowly by the Van still parked on 48th Court. (Tr. 42.)

Also at 1:12 p.m., agents saw the Suburban, driven by Defendant, exit the garage of the House and drive to a house in Milwaukee, Wisconsin. (Tr. 41-43.) At one point, at the request of the agents, Milwaukee County Sheriff conducted a traffic stop of the Suburban and found a T-Mobile receipt for a phone that had been purchased days earlier; the phone bore the same phone number the unidentified woman used to call the Cicero Police Department, claiming she observed suspicious activity involving the Van referred to above. (Tr. 43-44).

Oko further testified that at 6:30 p.m., a black pickup truck arrived at the House and that Oscar Montoya ("Oscar"), the Defendant's brother, exited the car and walked through the gangway toward the back of the House. (Tr. 50.) At 8:15 p.m., when Oscar was observed in front of the House, Oko approached Oscar, informed him that the House was being investigated for involvement in narcotics, and asked for his name and whether he lived at the House. Oko testified that Oscar indicated he lived at the House part-time and that when asked if he would allow agents

---

[7] The call was made from cell phone number (708) 226-3995. (Tr. 39.)

to search the House, Oscar gave Oko the keys and said "Go ahead." (Tr. 53-55.) According to Oko, Oscar said he would sign a consent-to-search form if he could leave the area. (Tr. 55.)

At around 8:30 p.m., Oko and other agents entered the House. (Tr. 58). Oko testified that he and the other agents thought that someone might be in the House destroying evidence because they had received 130 kilos from the Van that came out of the House's garage (the Van was under constant surveillance and had been at no other location where containers could be loaded into the Van), and Oscar was evasive and refused to sign a consent form. (Tr. 21, 22, 35, 46, 47, 56.) During the search, the agents did not find anyone in the House. However, the agents identified a large number of packages that were located in a closet off of a basement bedroom and that were similar in appearance to the packages confiscated from the Van. (Tr. 61-62.)

After determining no one was in the House, the agents retreated to the rear of the House, and awaited communication that the search warrant was signed by Magistrate Keys. When Borns called the agents at the House at about 1:30 a.m. on December 19, he informed them that the warrant was issued; the agents re-entered the House and conducted the search and seized the drugs. (*Id*.)

## ANALYSIS

A defendant who seeks to suppress evidence bears the ultimate burden of proof and persuasion in making a *prima facie* showing of illegality. *United States v. Randle*, 966 F.2d 1209, 1212 (7th Cir. 1992). Additionally, the defendant has the burden of establishing that his own Fourth Amendment rights were violated by the challenged seizure. *Id*. at 1212-13. To establish an illegal search, the defendant must demonstrate a personal expectation of privacy in the place that was searched. *Minn. v. Carter*, 525 U.S. 83, 88 (1998). Both parties appear to agree that Defendant resided at the House and, therefore, had a proprietary interest in the property.

*Exigent Circumstances*

The Government contends that exigent circumstances existed to justify the DEA's warrantless entry into the House. Searches and seizures inside a home without a warrant are presumptively unreasonable. *United States v. Etchin*, 614 F.3d 726, 733 (7th Cir. 2010) (citing *Payton v. New York*, 445 U.S. 573, 586 (1980). A recognized exception to this general rule is a warrantless entry and search of a home based on exigent circumstances.[8] *Id.* Exigent circumstances exist when there is a compelling need for official action and no time to secure a warrant, such as when "the police have an objective and reasonable fear that evidence is about to be destroyed." *United States v. Napu*e, 834 F.2d 1311, 1326 (7th Cir. 1987) (citation omitted). In such a situation, courts consider whether "'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.'" *United States v. de Soto*, 885 F.2d 354, 367 (7th Cir. 1989) (quoting *United States v. River*a, 825 F.2d 152, 156 (7th Cir. 1987)).

The Government argues that the DEA agents believed that a warrantless entry was justified based on Oscar's arrival at the House at 6:30 p.m. and Oko's encounter and interaction with Oscar an hour-and-a-half later, at 8:00 p.m. The Government argues that based on these facts, the DEA agents reasonably believed that narcotics "could" be easily destroyed by anyone in the home and that exigent circumstances justified their warrantless search.

These facts, however, do not justify the warrantless search on this basis. The Government acknowledges that the agents had been aware for many hours prior to their first entry into the House that their drug investigation had been compromised and known to Defendant. This is

---

[8] In footnote No. 5 of the Government's post-hearing brief, the Government notes that for purposes of justifying the warrantless search the night of December 18, 2010, it is not presenting argument that the agents received consent to search the House.

evidenced by the ruse telephone call earlier in the afternoon of December 18 from the unidentified woman regarding the Van. It is obvious that had Defendant intended to destroy the evidence seized, there was ample opportunity to do so during the several hours before the first entry in the House at approximately 8:30 p.m. The mere possibility that evidence might be destroyed is insufficient to justify a warrantless entry. *Etchin*, 614 F. 3d at 733. As stated in *Etchin*, while sounds, such as toilets flushing, doors slamming, people running, an obvious lie by the person answering, or efforts to remove contraband, may be evidence that there is an emergency justifying an immediate, warrantless intrusion, the sound of someone walking around or a voice announcing the police presence, alone, is not enough. *Etchin*, 614 F. 3d at 734.

Based on Oko's testimony, the agents had not seen any activity at the House from 1:12 p.m. (when the agents observed Defendant leaving the House) until 6:30 p.m. on December 18 (when Oscar arrived). After Oscar's arrival, the agents observed nothing until 8:00 p.m. (when Oko had a discussion with Oscar on the street in front of the House). The Government offers no other evidence that there was an emergency to justify the entry. These facts alone would not compel an immediate search based on exigent circumstances. The agents were aware that Defendant was not in the House, and the fact that Oscar arguably presented an evasive response to Oko's questions is not enough to justify a warrantless entry. Without more, the exigent circumstances doctrine does not apply.

*Independent Source Rule*

The Government argues that all evidence is admissible under the independent source doctrine because it was discovered through sources wholly independent of any constitutional violation. *See Murray v. United States*, 487 U.S. 533 (1988); *Segura v. United States*, 468 U.S. 796 (1984). The Seventh Circuit has explained the independent source doctrine as follows: "if

police discover items X and Y during an illegal search," but then in a later "untainted legal search police discover not only item Z but also rediscover items X and Y, X and Y as well as Z are admissible." *United States v. Markling*, 7 F.3d 1309, 1315 (7th Cir. 1993). The Supreme Court has noted that the policy behind the independent source rule is that excluding evidence that has a source independent of any agent's error or illegality would put agents in a worse position than they would have been without the error or illegality. *See Murray*, 487 U.S. at 537, 541-42.

In *Markling*, the Seventh Circuit considered whether a search warrant procured on both tainted and untainted information supported a valid search based on the untainted information in the warrant application. *Id.* at 1315-16. The court set forth a two-part test to determine whether evidence was, in fact, obtained by independent lawful means: (1) whether the illegally obtained evidence caused the magistrate to issue the search warrant; and (2) whether the officer's decision to seek a warrant resulted from what was seen (or seized) during the unlawful search. If the answer to both of these inquiries is no, then the evidence need not be suppressed despite the fact that it was initially unlawfully obtained. *Markling*, 7 F.3d at 1315-16; *Franks v. Delaware*, 438 U.S. 154 (1978) (holding that statements in an affidavit that are intentionally false or made with reckless disregard for the truth must be stricken, and then whether the warrant issued on probable cause must be determined by the affidavit with those statements excluded); *see also United States v. Jenkins*, 396 F.3d 751, 758 (6th Cir. 2005) (citing cases). In *Markling*, the court reasoned that though the warrant application contained tainted information, the untainted information, considered alone, established probable cause. 7 F.3d at 1315-17.

Regarding the second question, the agents, here, began working on a warrant application with AUSA Deis the afternoon of December 18. (Tr. 89-96.) The agents were in contact with AUSA Deis after the phone call ruse and discovery of 130 kilos of narcotics in the Van supplied to

the cooperating source. (*Id.* at 89-94.) The decision to seek a warrant was made by the agents and the AUSA in the afternoon of December 18 and, thus, not as a result of what was seen during the warrantless search. (Tr. 95-96.)

The first question requires a close examination of the specific averments of only the untainted information that formed the basis for the issuance of the search warrant. The affidavit submitted contained numerous paragraphs in support of probable cause, including several paragraphs regarding the history and background of the Zetas and, in pertinent part, the following paragraphs:

> 3. This application seeks authorization to search the premises consisting of the single-family residence located at 2536 South Harvey Avenue, Berwyn, Illinois and, as further described in Attachment A (hereinafter, "Subject Premises").
>
> 9. More specifically, since March 2010, DEA and ICE have seized narcotics proceeds on multiple occasions, including, but not limited to, the following: (1) approximately $9,428,950 on April 30, 2010 in Chicago, Illinois, pursuant to a search warrant (based on information from CS-1); (2) approximately $1 million on May 28, 2010 in Laredo, Texas; (3) approximately $1.2 million on June 7, 2010; and (4) approximately $2 million on July 9, 2010 in Pryor, Texas (picked up in Chicago by an ICE undercover officer, delivered to ZETAS DTO members in Texas and subsequently seized in Pryor, Texas).
>
> 10. In addition, DEA and ICE have conducted multiple controlled pick-ups/deliveries of bulk quantities of narcotics proceeds, including the following: (1) April 22, 2010 (believed to involve approximately $2 million based on information from CS-1); (2) April 27, 2010 (involving 2 bags and 47 bundles of USC, believed to involve approximately $2 million based on information from CS-1); (3) April 29, 2010 (involving 3 bags and 66 bundles of USC); (4) June 7, 2010 (involving 4 bags and 70 bundles of USC); (5) July 7, 2010 (involving the $ 2 million seized in Pryor, Texas as referenced above); and (6) November 30, 2010 (involving approximately $999,770 seized in Eagle Pass, Texas on December 2, 2010).
>
> 11. On approximately December 17, 2010, CS-1 informed law enforcement that the ZETAS DTO had approximately $22 million in narcotics proceeds to move from Chicago, Illinois to Mexico. CS-1 further informed law enforcement that the ZETAS DTO had approximately 300 kilograms of low quality cocaine that was to be returned to Mexico.

16. As part of this operation, CS-2 used a tan Chrysler Town & Country minivan (hereinafter, "Subject Van"). At approximately 12:00 p.m., law enforcement searched the Subject Van for narcotics and other contraband, with negative results. Law enforcement then maintained constant surveillance on CS-2 and the Subject Van as CS-2 traveled from the search location to a parking lot in the area of 31st Street and Cicero Avenue in Cicero, Illinois. CS-2 exited the Subject Van and left the car keys under the mat, as CS-2 had been directed to do by INDIVIDUAL B.

17. At the parking lot in the area of 31st Street and Cicero Avenue, an unidentified individual ("FNU LNU 1") picked up the Subject Van and drove to the Subject Premises. During this time, law enforcement maintained constant surveillance and the Subject Van made no stops.

18. At approximately 12:30 p.m., law enforcement observed the Subject Van enter the garage in the alley behind the Subject Premises. At approximately 12:40 p.m., law enforcement observed the Subject Van depart from the garage of the Subject Premises.

19. Law enforcement followed the Subject Van back to the area of 48th Court between 29th and 30th Streets in Cicero, Illinois. Again, law enforcement maintained constant surveillance and the Subject Van made no stops. At approximately 12:50 p.m., law enforcement observed FNU LNU 1 exit the Subject Van. Law enforcement maintained constant surveillance on the Subject Van and observed no one else enter or exit the Subject Vehicle. The Subject Vehicle remained stationary.

21. At approximately 12:50 p.m., after FNU LNU 1 exited the Subject Van, law enforcement observed FNU LNU 1 enter a black Chevrolet Suburban truck, registered to Jesse Montoya (hereinafter, "Suburban Truck"). Jesse Montoya's Illinois driver's license lists the address of the Subject Premises.

22. Law enforcement observed the Suburban Truck park in the garage of the Subject Premises. At the Subject Premises, law enforcement observed FNU LNU 1 and the driver of the Suburban Truck exit the garage and enter the back door of the Subject Premises.

20.[9] At approximately 2:30 p.m., law enforcement took custody of the Subject Van. Law enforcement searched the Subject Van. During a search of the Subject Van, law enforcement recovered approximately 130 individually wrapped brick-shaped objects wrapped in brown packaging tape, concealed inside two

---

[9] In the affidavit, Paragraph 20 appears in correct numerical sequence. For purposes of this Opinion, paragraph 20 was moved to reflect that the timing of the event occurred after the events in paragraphs 21 and 22 of the affidavit.

> Rubbermaid bins and a large duffle bag. Law enforcement opened and field tested three of the packages and found a white powdery substance, which field tested positive for cocaine.
>
> 29. Affiant does not rely on the information in paragraphs 23-38 [*sic*] for purposes of establishing probable cause.[10]

Defendant contends that agent Borns' disavowal of reliance on information learned in the warrantless search (paragraph 29) in support of the warrant application undercuts a finding that the independent source rule applies because Judge Keys could not "unremember" the fact that the agents had discovered packages in the House consistent in appearance with the 130 kilos discovered earlier in the day. Defendant notes that in *Murray*, the Court found it significant that the magistrate had not been apprised of the existence or results of the prior illegal search.

However, even without the "tainted" information that the agents discovered when they initially entered the House, the warrant application in the paragraphs cited above establish probable cause to search the house. *Markling*, 7 F.3d at 1317 ("determining whether probable cause exists involves 'a practical, common-sense decision whether, given all the circumstances set forth . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'") (citations omitted); *see United States v. Hanhardt*, 155 F. Supp. 2d 840, 844 (N.D. Ill. 2001) (applying independent source doctrine and denying motion to suppress evidence obtained by a search warrant that was based on facts in existence prior to a warrantless search).

Agent Borns' affidavit recites facts that, since March 2010, the DEA and other federal agencies had seized narcotics and currency and observed multiple pick ups and deliveries (paragraphs 9-10) and that the DEA was conducting an ongoing investigation involving the Zetas

---

[10] Paragraphs 23 through <u>28</u> set out facts of the previous entry onto the subject premises, including the fact that the agents observed 130 kilos of suspected cocaine. (This statement refers to excluding paragraphs 23 through 38; when the affidavit is read in its entirety, it is clear that it was intended to refer to paragraphs 23 through 28.)

and that approximately 300 kilos of cocaine were to be returned to Mexico (paragraph 11). The otherwise empty Van provided by the agents to the cooperating source on December 18 was driven directly to the detached garage at the House (paragraphs 17, 18). Ten minutes later, the agents observed the Van travel directly to the location of 48th Court between 29th and 30th Streets in Cicero, Illinois (paragraphs 18, 19). The affidavit states that the agents found 130 kilos of cocaine after they searched the Van at the 48th Court location (paragraph 20). Defendant's driver's license lists the address of the House (paragraph 21). The affidavit states that the only place the Van had been was the garage at the House. The confidential informant's statements to law enforcement (which demonstrated to be highly reliable in the past), that 300 kilos of cocaine were to be returned to Mexico, provide support that a significant amount of cocaine in addition to the 130 kilos found in the Van had not yet been located. These circumstances and the other related averments in the affidavit cited above establish probable cause that the cocaine recovered had come from the House and that an additional quantity remained at the House to issue the warrant to search the subject premises.

Based on the course of events occurring on December 18, the agents would have applied for a warrant even without the warrantless search; and sufficient untainted information supports Judge Keys' decision to authorize issuing a search warrant of the House. In addition, Defendant does not demonstrate why Judge Keys could not have found probable cause based on the "untainted" information in the affidavit. *See United States v. McIntire*, 516 F.3d 576, 577-78 (7th Cir. 2008) (a review of a search warrant affidavit for probable cause requires great deference to the judge issuing the warrant); *United States v. Quintanilla*, 218 F.3d 674, 677 (7th Cir. 2000) (noting magistrate's finding of probable cause is given "considerable weight" and should be overruled only when affidavit does not sufficiently show items to be seized are likely to be in

location to be searched); *see also United States v. Leon*, 468 U.S. 897, 914 (1984) (noting that reasonable minds frequently may differ on whether a particular affidavit establishes probable cause, and great deference is afforded to a magistrate's determination). The agents' decision to seek the warrant did not necessarily result from what they had seen during the unlawful search. Accordingly, the independent source rule applies; and Defendant's Motion to Suppress is denied.

*Good Faith Exception Rule*

The Government argues that evidence obtained pursuant to the search warrant is admissible under the "good faith" exception rule articulated in *Leon*, 468 U.S. at 897. In *Leon*, the Supreme Court held that evidence obtained by officers acting in reasonable reliance on a search warrant issued by a magistrate is admissible even though the warrant is later found to be invalid for lack of probable cause.

Here, Defendant argues that the agents knew that they conducted a warrantless search prior to obtaining a warrant and that therefore, the agents did not act in good faith because the warrant application disclosed the search to Judge Keys. Unlike *Leon*, however, here, there is no basis to find that the warrant application was deliberately false in this case. *See Leon*, 468 U.S. at 914-15. The warrant application recited events independent of the agents' warrantless entry on December 18. In addition, rather than withholding the warrantless entry in the application to Judge Keys, the agents disclosed it. The disclosure tends to support the Government's argument that the agents were truthful and acted in good faith. *Franks*, 438 U.S. 154 (suppression remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in

14

an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth). Nevertheless, because the independent source doctrine applies and is controlling, it is not necessary to determine the issue of whether the "good faith" exception rule applies.

## **CONCLUSION**

For the reasons set forth above, Defendant's Motion to Suppress [191] is denied.

Date: 11/3/2016

_____
JOHN W. DARRAH
U.S. District Court Judge